**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| PORTAL TECHNOLOGIES LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 2:11-CV-440-JRG |
| | § | |
| YAHOO! INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff Portal Technologies LLC's Opening Claim Construction

Brief (Dkt. No. 62).  Also before the Court are Defendant Yahoo! Inc.'s response (Dkt. No. 69)

and Plaintiff's reply (Dkt. No. 72).

The Court held a claim construction hearing on January 30, 2013.

**Table of Contents**

I.   BACKGROUND .................................................................................................... 3

II.  LEGAL PRINCIPLES ......................................................................................... 5

III. CONSTRUCTION OF DISPUTED TERMS ...................................................... 9

   A.   "computer" (Claims 1, 5, 6, 11-13, 15-19, 21, 22, 24-49 & 60-86) .................................... 9

   B.   "customized interface screens in a plurality of computers" (Claims 1, 13, 24 & 36)......... 14

   C.   "providing a generally uniform look and feel with other interface screens of said
      plurality of computers" (Claims 1 & 24) and "a generally uniform look and feel with
      other customized interface screens of said plurality of computers" (Claims 13 & 36) ...... 18

   D.   "customized assortment of information content" (Claims 1, 5, 6, 11-13, 15, 16, 18-24,
      28, 29, 34-36, 38, 39, 41-44, 46-50, 59, 61, 62, 70-72 & 77).............................................. 23

   E.   "pre-defined constraints" (Claims 1, 3, 13, 24, 26 & 36).................................................... 26

   F.   "screen element" and "interface screen element" (Claims 1-3, 5, 6, 9-26, 28, 29, 32-50,
      53, 54, 56, 59-72, 74, 75, 77 & 80-86) ................................................................................. 28

   G.   "information content" (Claims 1, 5-7, 9-13, 15, 16, 18-24, 28-30, 32-36, 38, 39, 41-50,
      59-62, 70-72 & 77) ............................................................................................................... 28

IV.  CONCLUSION .................................................................................................... 31

## I. BACKGROUND

Plaintiff asserts United States Patent No. 6,658,418, titled "Authoring System for Computer-Based Information Delivery System," which issued on December 2, 2003, from an application filed on May 28, 2002.  The '418 Patent bears a priority date of February 27, 1996.

The '418 Patent contains four independent claims (Claims 1, 13, 24, and 36) and, in general, provides that users who lack computer programming skills can use a limited set of pre-defined elements to construct graphical user interface screens.  (*See* '418 Patent at 3:53-57.)  For example, a kiosk at a ski resort can be configured to provide information relating to products, services, and amenities.  (*See id.* at 1:47-57.)  In addition to lowering the skill level needed to create an interface, limiting the design choices also speeds up the process.  (*See id.* at 3:33-37.)  Further, limiting the design choices aids in achieving a uniform aesthetic design across multiple kiosks, such as at different locations of the same company.  (*See id.* at 5:48-54.)  The aesthetic elements may include, for example, colors, fonts, window borders, and button styles and sizes. (*See id.* at 3:62-4:4.)

The Abstract of the '418 Patent states:

A multimedia kiosk authoring system for use in developing and maintaining user interface screens for multimedia kiosk systems.  The authoring system enables the user interface for each individual kiosk to be customized quickly and easily within wide limits of variation, yet subject to constraints adhering the resulting interface to good standards of aesthetics and user friendliness.  The system may be used to provide custom interfaces expeditiously even for hundreds of kiosks presenting information from numerous independent information sources.  The authoring system uses the methods of object oriented programming to define specialized object classes for instantiation on individual kiosk interface screens subject to pre-defined limitations on variability.  Links are provided to an appropriate database for multimedia presentations on an interface screen of content bearing information from the information providers.

The '418 Patent is a continuation of United States Patent No. 6,014,137.  The '137 Patent, which is not asserted in the present case, was litigated in the Northern District of

3

California by Plaintiff's predecessor, Datamize LLC.  The court granted summary judgment,
finding that the term "aesthetically pleasing" rendered claims of the '137 Patent indefinite.  The
Court of Appeals for the Federal Circuit affirmed.  *Datamize LLC v. Plumtree Software, Inc.*,
417 F.3d 1342, 1356 (Fed. Cir. 2005).

The '418 Patent and a sibling patent, United States Patent No. 6,460,040, were then the
subject of a second action in the Northern District of California.  The court granted summary
judgment of invalidity based on an on-sale bar.  The Federal Circuit vacated and remanded.
*Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1156 (Fed. Cir. 2006).  Judge Vaughn
Walker of the Northern District of California then construed certain terms in the '418 Patent and
the '040 Patent in *Datamize, LLC v. Plumtree Software, Inc., et al.*, No. 3:04-CV-2777, Dkt.
No. 89, 2007 WL 5720627 (N.D. Cal. Aug. 7, 2007) (slip opinion attached to Plaintiff's opening
brief (Dkt. No. 62) as Exhibit 4).  Judge Walker's claim construction opinion is sometimes
referred to as *Plumtree II* but may be referred to here simply as *Plumtree*.  The parties to that
case settled before trial.

The '418 Patent and the related '040 Patent were also asserted in the Eastern District of
Texas in *Datamize Inc v. Fidelity Brokerage Service LLC, et al.*, No. 2:03-CV-321.  Judge
Folsom held a claim construction hearing on December 21, 2004.  Separately, the parties briefed
a motion for summary judgment of indefiniteness.  The parties to that case all settled before the
Court entered any rulings on claim construction or indefiniteness.

Plaintiff then filed the present case on September 30, 2011, together with a case against
AOL Inc. and another case against a group of defendants known as "IAC."  *Portal Techs. LLC v.
AOL Inc.*, No. 2:11-CV-438; *Portal Techs. LLC v. IAC/InterActiveCorp*, No. 2:11-CV-439.  The
AOL and IAC cases settled in late 2012.

4

MicroStrategy Inc., which is not a party here, filed an *inter partes* reexamination request with the United States Patent and Trademark Office ("PTO") on June 15, 2012.  The PTO issued an Action Closing Prosecution on December 6, 2012, rejecting all claims of the '418 Patent. Defendant requested a stay of the present case pending the final outcome of the reexamination. The Court denied that motion on January 3, 2013, finding that the reexamination proceedings are still at a very early stage.  (*See* Dkt. No. 80.)

## II.  LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is clearly an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention.  *Id.*  A patent's claims must be read in view of the specification, of which they are a part.  *Id.*  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id.*  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims."  *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention.  Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own

lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.  In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id.*  The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art.  *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*  Although the claims themselves may provide guidance as to the meaning of

6

particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315

(quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as

being the primary basis for construing the claims.  *Id.* at 1314-17.  As the Supreme Court stated

long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive

portions of the specification to aid in solving the doubt or in ascertaining the true intent and

meaning of the language employed in the claims."  *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In

addressing the role of the specification, the *Phillips* court quoted with approval its earlier

observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.

1998):

> Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and
> intended to envelop with the claim.  The construction that stays true to the claim
> language and most naturally aligns with the patent's description of the invention
> will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316.  Consequently, *Phillips* emphasized the important role the

specification plays in the claim construction process.

   The prosecution history also continues to play an important role in claim interpretation.

Like the specification, the prosecution history helps to demonstrate how the inventor and the

Patent and Trademark Office ("PTO") understood the patent.  *Id.* at 1317.  Because the file

history, however, "represents an ongoing negotiation between the PTO and the applicant," it may

lack the clarity of the specification and thus be less useful in claim construction proceedings.  *Id.*

Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of

how the inventor understood the invention and whether the inventor limited the invention during

prosecution by narrowing the scope of the claims.  *Id.*; *see Microsoft Corp. v. Multi-Tech Sys.*,

*Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony.  The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24.  According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."  *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter.  *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record.  In doing so, the court emphasized that claim construction issues are not resolved by any magic formula.  The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language.  *Id.* at 1323-25.  Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

In general, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable

*per se.*"  *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779,

at \*4 (E.D. Tex. June 21, 2006).

## III.  CONSTRUCTION OF DISPUTED TERMS

After the close of briefing, the parties reached agreement on the proper construction for

"screen element" and "interface screen element," as noted in Section III.F, below.  The parties

have not reached any other agreed constructions.

At the January 30, 2013 hearing, the parties disputed six groups of terms.  For five of the

groups of terms, Plaintiff proposed that no construction is required.

## A.  "computer" (Claims 1, 5, 6, 11-13, 15-19, 21, 22, 24-49 & 60-86)

| Plaintiff's Proposal | Defendant's Proposal | *Plumtree* |
|---|---|---|
| No construction necessary; plain meaning | "a general purpose computer configured to present only information that is appropriate for that computer" | No construction necessary |

(Dkt. No. 76, Ex. A, 1/2/2013 P.R 4-5(d) Claim Construction Chart, at 1; 2007 WL 5720627,

at \*4.)

(1)  The Parties' Positions

Plaintiff argues that "computer" is "a non-technical word that can easily be understood by

a lay juror" and that "[a]ttempting to construe it would add nothing in the way of clarity for the

jury." (Dkt. No. 62, at 11.)

Defendant emphasizes that the "Summary of the Invention" set forth in the '418 Patent

discloses that "[e]ach kiosk, however, is customized to present only the information that is

appropriate to that kiosk." (Dkt. No. 69, at 11 (quoting '418 Patent at 3:45-46).)  Defendant

notes that the specification contains no disclosure of customizing web pages for, or by,

individual end users.  Defendant also highlights disclosure that the "system author" selects the

pre-defined interface screen elements that will be displayed to end users, and the end users can only receive information in the manner determined by the software creator and the system author.  (*Id.*, at 8 (discussing '418 Patent at 22:16-35).)

Defendant further emphasizes that this Court is not bound by Judge Walker's claim construction rulings.  (Dkt. No. 69, at 10 (citing *Paltalk Holdings, Inc. v. Microsoft Corp.*, No. 2:06-CV-367, 2008 U.S. Dist. LEXIS 94462, 2008 WL 4830571, at *12 (E.D. Tex. July 29, 2008) (Folsom, J.); *Logan v. Hormel Foods Corp.*, No. 6:04-CV-211, 2004 U.S. Dist. LEXIS 30327, 2004 WL 5216126, at *2 (E.D. Tex. Aug. 25, 2004) (Davis, J.) ("[T]his Court is not bound by Judge Werlein's claim construction because that case settled prior to final judgment on the merits.")).)  Defendant also argues that Judge Walker's *Plumtree* case involved a different type of accused product (corporate portal software rather than end-user websites) and involved an additional patent, such that different arguments and issues were presented to the court.  (*Id.*, at 15.)

Plaintiff replies that

the sentence that Defendant is relying upon refers to a "kiosk" embodiment of the invention.  A kiosk, which might in some embodiments present "only" certain information, is one type of computer.  E.g., '418/1:16-20 ("An electronic kiosk refers to a computer-based information delivery system ...").  Although the patentee could have limited the '418 claims to a specific kiosk embodiment, it chose the broader term "computer."

(Dkt. No. 72, at 2.)

(2)  Analysis

Claim 1 is representative and recites (emphasis added):

1.  A method for providing customized assortment of information content from a plurality of information providers for display in one or more customized interface screens in a plurality of *computers*, comprising:
enabling selection of a customized assortment of information content from information content from said plurality of information providers;

enabling selection of at least one interface screen element from a plurality of
pre-defined interface screen elements for inclusion in said customized
interface screens,
said screen elements having on-screen characteristics subject to pre-
defined constraints providing a generally uniform look and feel with
other interface screens of said plurality of *computers*; and
associating a selection of a customized assortment of information content for a
first *computer* of said plurality and a selection of at least one screen
element for said first *computer* for display on said first *computer* in said
one or more customized interface screens.

The Background of the Invention discloses:

Some of the problems to be overcome to make a kiosk system of this sort
commercially viable are[:] the organization of the data for potentially hundreds of
kiosks and even more data sources so that a customized selection of data will be
accessible to users at each of the kiosks; the customization of the user interface
for each of the potentially hundreds of kiosks or more in the system in a manner
that is economically feasible; the ability to update the data available to the kiosks
quickly and easily; and the ability to modify the user interface of any one kiosk
quickly and easily.

('418 Patent at 2:49-58.)  The Summary of the Invention discloses:

The present invention provides a multimedia kiosk authoring system for use in
developing and maintaining multimedia kiosk systems.  The authoring system
enables the user interface for each individual kiosk to be customized quickly and
easily within wide limits of variation, yet subject to constraints adhering the
resulting interface to good standards of aesthetics and user friendliness.  The
system may be used to provide custom interfaces expeditiously even for hundreds
of kiosks.  The authoring system also provides for organization of information
from numerous information sources, referred to herein generally as information
providers.  The system makes it easy to set up, maintain, and update a great
variety of kiosks with large amounts of information potentially available to each
kiosk.  Each kiosk, however, is customized to present only the information that is
appropriate to that kiosk.

(*Id.* at 3:31-46.)

Defendant argues as to "computer" and other disputed terms that "[Plaintiff's] overly

broad constructions should be rejected or the patent's validity will be at risk."  (Dkt. No. 69, at

28.)  In particular, as to "computer," Defendant argues that "[a]ny broader interpretation expands

11

the claims outside the written description of the specification, thereby rendering the claims invalid." (*Id.*, at 11.)

Defendant has not argued for a finding of invalidity based on indefiniteness, and other validity issues, such as lack of written description, are generally not considered as part of claim construction. *Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a regular component of claim construction."). Thus, Defendant's reliance on the purportedly narrow scope of the patent's disclosure should not be given any special weight. Instead, the scope of the disclosure is merely a factor for the Court to consider, as always, in evaluating how a person of ordinary skill in the art would understand the claim language.

On one hand, statements that characterize the invention as a whole, particularly statements that appear in the Summary of the Invention, can be limiting. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1379 (Fed. Cir. 2005); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1345 (Fed. Cir. 2001). As noted above, the Summary of the Invention discloses that "[e]ach kiosk, however, is customized to present only the information that is appropriate to that kiosk." ('418 Patent at 3:45-46.) Further, the Background of the Invention discloses the desirability and potential importance of presenting only information that is appropriate for a particular computer. ('418 Patent at 1:63-65 ("The hotel kiosk would generally not provide information about other hotels in the area and may or may not provide information on restaurants outside the hotel.").)

On the other hand, the claims of the '418 Patent recite a "computer" rather than a "kiosk." Defendant has relied upon disclosure of "computer kiosks" and that the term "kiosk" can include "general purpose computers configured to serve the same functions as a stand-alone kiosk" ('418 Patent at 4:8 & 4:58-61), but those disclosures do not limit "computer" to "kiosk."

Although the disclosed embodiment relates to programming for specific kiosks rather than for specific end users, even "the fact that the specification describes only a single embodiment, standing alone, is insufficient to limit otherwise broad claim language." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345 (Fed. Cir. 2008). In the absence of any clear lexicography or disavowal, the ordinary meaning of "computer" should apply. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).

Thus, the generic term "computer" should not be limited to presenting information that is appropriate for a specific computer at a particular location. *See Plumtree,* 2007 WL 5720627, at *4 (construing the term "kiosk" as being narrower than "computer," specifically as meaning "a computer-based interactive system that delivers information to a user in order to allow the user to make selections or initiate transactions.").

Finally, Defendant argued at the January 30, 2013 hearing that the plain meaning of the term "computer" has changed substantially since the 1996 priority date of the patent-in-suit. Citing *O2 Micro*, Defendant urged that a construction is necessary to avoid impermissibly submitting a claim construction issue to the jury at trial. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351 (Fed. Cir. 2008). Defendant, however, presented no evidence of any relevant, substantial change in the plain meaning of "computer" that would necessitate any claim construction regarding what general advancements in computer technology are or are not within the scope of the term.

The Court therefore hereby expressly rejects Defendant's proposed construction and hereby construes **"computer"** to have its **plain meaning**.

## B. "customized interface screens in a plurality of computers" (Claims 1, 13, 24 & 36)

| Plaintiff's | Defendant's Proposal | *Plumtree* |
|---|---|---|
| No construction necessary; plain meaning | "interface screens of multiple computers that are configured to present only the information that is appropriate to those computers and which are displayed to all end users of those computers"<br><br>Defendant also proposes that the Court find: "This term does not extend to providing: (a) interface screens that are customized for each individual user of the plurality of computers; or (b) customized interface screens that are customizable by end users of those computers. | Not addressed |

(Dkt. No. 76, Ex. A, 1/2/2013 P.R 4-5(d) Claim Construction Chart, at 1.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues that the disputed term "uses non-technical words that can easily be understood by a lay juror."  (Dkt. No. 62, at 13.)  As to Defendant's proposed negative limitations, Plaintiff urges that "nothing in the specification or the claims states or even reasonably suggests that the versatile and customizable computers of the claimed invention are not customizable by end users or not customizable for specific users."  (*Id.*, at 14.)  Alternatively, Plaintiff submits that embodiments and examples appearing in the specification should not be read into the claims.  (*Id.*, at 15.)

Defendant responds that "[i]t is fundamental to the invention that customization of interface screens occurs for each kiosk depending on its location, without regard to any particular end-user."  (Dkt. No. 69, at 16.)  Defendant also argues that customizing web pages for or by individual end users is "very different" from customizing interfaces for particular computers:

> Because there is no disclosure in the specification to support customization of web pages by or for each individual end-user, [Defendant] requests that this be made clear in the claim construction by including an explanation that the claim term at issue does not extend to providing: (a) interface screens that are customized for each individual end-user of the plurality of computers; or (b) customized interface screens that are customizable by end-users of those

14

computers.  Displaying web pages customized for each end-user is a very
different invention than displaying screens customized for a particular computer.
In order to customize web pages for each end-user there must be a way to identify
that particular end-user, allow that end-user to make selections, store those
selections, determine which end-user is using a particular computer, and present a
particular end-user's selections at a particular computer.  There is no disclosure of
identifying an end-user's selections using a profile, log-in, or any other
identifying traits.  No usernames, passwords, log-ins, profiles, etc. are saved to the
database disclosed in the '418 Patent.  Even if there were some disclosure of these
requirements, the invention fails to disclose how to present the correct
customization to any particular end-user at a specific location.  There is no
disclosure of associating any end-user identification (i.e., username, profile, etc.)
with any of the selections.  In fact, there is no disclosure of serving web pages in a
browser at all in the '418 Patent specification.  All of these aspects are critical to
serving a customized web page for each end-user.  However, there is no
disclosure of any of these steps in the '418 Patent because the customization it
describes is specific to a particular device not a specific individual end-user.

(*Id.*, at 18.)

Plaintiff replies that Defendant's proposal would exclude the preferred embodiment in

which it is "easier for a large number of persons to set up kiosk interface screens" ('418 Patent at

3:52-56), "[t]he authoring system enables the user interface for each individual kiosk to be

customized" (*id.* at 3:33-37), and in a preferred embodiment for ski shops, kiosks at different ski

shops are "customized for each shop" (*id.* at 1:57-60), "each having its own user interface and

presenting its own unique selection of information." (*id.* at 2:2-7).  (Dkt. No. 72, at 3.)  Plaintiff

also argues that "multiple dependent claims indicate that customization is performed or enabled

to be performed 'at said server,' which means that for the independent claims the customization

may be performed or enabled to be performed at a server or locally." (*Id.*, at 4 (citing '418

Patent at Claims 23 and 46).)  Plaintiff concludes that "[Defendant's] argument that that 'user'

cannot be an 'end user' is simply wrong." (*Id.*, at 4.)  Finally, as to Defendant's argument that

web pages are "very different" from customized interface screens, Plaintiff replies that "without

a doubt web pages are viewed on interface screens." (*Id.*, at 5 (quoting Dkt. No. 69, at 18).)

15

(2)  Analysis

Claim 1 is representative and is reproduced in Section III.A., above.  The Background of

the Invention discloses:

> The present invention addresses the development of an electronic kiosk system
> comprising a large number of individual kiosks located at a variety of different
> sites for providing a selection of information customized to each site.  For
> purposes of illustration the present invention is discussed in the context of a kiosk
> system serving a geographical region popular for skiing.  Kiosks may be located,
> for example, at individual ski areas, at hotels and resorts in the area, and at ski
> shops and other retail shops.  The information available to a user at an individual
> kiosk will depend on the nature of the establishment in which the kiosk is located.
>
> * * *
>
> Some of the problems to be overcome to make a kiosk system of this sort
> commercially viable are the organization of the data for potentially hundreds of
> kiosks and even more data sources so that a customized selection of data will be
> accessible to users at each of the kiosks; the customization of the user interface
> for each of the potentially hundreds of kiosks or more in the system in a manner
> that is economically feasible; the ability to update the data available to the
> kiosks quickly and easily; and the ability to modify the user interface of any one
> kiosk quickly and easily.

('418 Patent at 1:43-53 & 2:49-58.)

The Summary of the Invention discloses that large numbers of kiosks can be customized

quickly and easily:

> The present invention provides a multimedia kiosk authoring system for use in
> developing and maintaining multimedia kiosk systems.  The authoring system
> enables the user interface for each individual kiosk to be customized quickly and
> easily within wide limits of variation, yet subject to constraints adhering the
> resulting interface to good standards of aesthetics and user friendliness.  The
> system may be used to provide custom interfaces expeditiously even for hundreds
> of kiosks.

('418 Patent at 3:31-39.)

The '418 Patent does not restrict the "system author" to being someone other than an end

user.  *See* '418 Patent at 3:58-60 (". . . an individual using the authoring software to devise a

kiosk interface screen (that individual is referred to herein as a 'system author') . . . .").)  Further,

although the term "user" appears throughout the '418 Patent, the term "end user," which

Defendant submits as part of its proposed negative limitations, does not appear in the '418

Patent.

Finally, as to claim differentiation, Claim 23 depends from Claim 20, which in turn

depends from independent Claim 13.  Claims 20 and 23 recite (emphasis added):

> 20.  The method of claim 13 wherein said customized assortment of information
> content is selected from information content provided by a server and wherein
> said at least one interface screen element is selected from said plurality of pre-
> defined interface screen elements provided by said server.
>
> * * *
>
> 23.  The method of claim 20 wherein the selection of said customized assortment
> of information content and the selection of said at least one interface screen
> element are performed at said server.

Thus, dependent Claim 20 recites that information content and interface screen elements are

provided by a server, and Claim 23 recites that customization is "performed at said server."  The

doctrine of claim differentiation therefore weighs in favor finding that customization need not be

performed at a server.  *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that

adds a particular limitation gives rise to a presumption that the limitation in question is not

present in the independent claim.") (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898,

910 (Fed. Cir. 2004)).  Instead, customization could be performed locally.  The claims are thus

consistent with allowing for customization by any user.

On balance, customization for a group of users rather than for a specific end user, as well

as customization by someone other than the end user, are aspects of the preferred embodiment

that should not be imported into the claims.

The Court therefore hereby expressly rejects Defendant's proposed negative limitations, and the Court hereby construes **"customized interface screens in a plurality of computers"** to have its **plain meaning**.

**C. "a generally uniform look and feel with other interface screens of said plurality of computers" (Claims 1 & 24) and "providing a generally uniform look and feel with other customized interface screens of said plurality of computers" (Claims 13 & 36)**

| Plaintiff's Proposal | Defendant's Proposal | *Plumtree* |
|---|---|---|
| No construction necessary except that the constituent term "generally uniform look and feel" should be construed to mean:<br><br>"a degree of variation in its on-screen characteristics sufficiently limited to ensure that a user can create customized screens that are generally uniform" | "a degree of variation in the characteristics of the customized interface screens that is sufficiently limited to ensure that those screens are almost the same across multiple computers" | The term "uniform look and feel" was construed to mean:<br><br>"a degree of variation in its on-screen characteristics sufficiently limited to ensure that a user can create customized screens that are generally uniform" |

(Dkt. No. 76, Ex. A, 1/2/2013 P.R 4-5(d) Claim Construction Chart, at 1-2; 2007 WL 5720627, at *7.)

<u>(1)  The Parties' Positions</u>

The parties agree that to the extent these terms are construed, the two disputed terms should be given the same construction.  The parties have not disputed the meaning of "providing," so that portion of the disputed term in Claims 13 & 36 requires no construction. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see O2 Micro*, 521 F.3d at 1362 ("[D]istrict

18

courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

Plaintiff argues that Defendant "seeks to subvert the straight-forward concept of 'generally uniform,' into a more limiting definition neither found in the patent nor warranted by the intrinsic evidence."  (Dkt. No. 62, at 16.)  Plaintiff submits that "this is a plain and ordinary term that would be easily understood by a lay jury . . . ."  (*Id.*)

Defendant argues that its proposal "makes clear two aspects of the term: (1) the screens have to be sufficiently similar to be considered 'almost the same' in appearance and (2) the screens are almost the same between multiple computers."  (Dkt. No. 69, at 19).  Defendant emphasizes as to the *Plumtree* construction that "[s]ince the phrase 'plurality of computers' was unique to the '418 Patent[,] it was not the focus of the parties' dispute and not addressed by the *Plumtree* claim construction," which addressed the '040 Patent in addition to the '418 Patent.  (*Id.*, at 21.)

Plaintiff replies that "[e]mbodiments of the patented system enable the user interface for each individual computer or user to be customized quickly and easily within wide limits of variation, yet subject to pre-defined constraints providing a generally uniform look and feel."  (Dkt. No. 72, at 7 (citing '418 Patent at 3:33-37).)  Plaintiff also submits that the *Plumtree* claim construction is persuasive authority.  (*Id.*, at 8.)

After the close of briefing, on January 25, 2013, Defendant filed a Notice of Patent Owner's Response to Action Closing Prosecution in Reexamination ("Response to ACP").  (Dkt. No. 83.)  Plaintiff filed the Response to ACP on January 23, 2013.  (Dkt. No. 83, at 1.)  At the January 30, 2013 hearing, Defendant argued that while distinguishing the "Risberg" reference, the Response to ACP definitively stated that uniformity of look and feel must be the same across

multiple computers and that customization is for particular computers, not for particular users.

Plaintiff responded that the Response to ACP distinguished Risberg as lacking the "pre-defined

constraints" required by the claims of the patent-in-suit.

(2)  Analysis

The Summary of the Invention discloses:

> The present authoring system is particularly advantageous in that it may be used by persons with little or no experience in the intricate details of computer programming thereby making it easier for a larger number of persons to set up kiosk interface screens.  It is a further advantage of the present authoring system that an individual using the authoring software to devise a kiosk interface screen (that individual is referred to herein as a "system author") is only given a limited range of choices for stylistic and functional elements appearing in the screen displays.  In this way major aesthetic or functional design choices such as button s[t]yles and sizes, window borders, color combinations, and type fonts as well as hierarchical methods of retrieving information may be built into the system taking into account the considered opinions of aesthetic design specialists, database specialists, and academic studies on public access kiosk systems and user preferences and problems.  Only a limited range of pre-defined design choices is then made available to a system author.

('418 Patent at 3:53-4:4.)

The specification further discloses that uniformity can be maintained across multiple

computers:

> The button placement in FIG. 2A is generally fixed along two adjacent edges. This is an aesthetic choice, but it is a choice that is forced by the authoring software to assure that once an aesthetically and functionally acceptable button size and layout has been chosen, it will be maintained throughout all further screen layouts *for all kiosks* without having to expend time and effort re-creating an acceptable button layout anew for each kiosk.

(*Id.* at 5:47-54 (emphasis added).)

The requirement of uniformity across multiple computers is confirmed by the Response

to ACP (italics in original; underlining added for emphasis):

> The whole purpose of Risberg . . . is to provide a system and method for each user to create their own customized screens.  Nothing has been cited in the Request or

20

the ACP that discloses where in Risberg it describes that a user is limited in creating screens that have a generally uniform look and feel.  Risberg allows each user to create customized screens according to *their own personal "look" or style* through *full control* of the fonts, colors, groupings, locations, format, fonts, styles, etc.  However, nothing has been cited from Risberg that states that user's personal look or style of a screen has pre-defined constraints providing a generally uniform look and feel with other interface screens of said plurality of computers.  The method in Risberg gives a user the freedom to arrange the available data *in a style* which best suits the user's management and/or analysis style.  The purpose of Risberg is clear in providing the necessary tools to give a user the ability to define an interface screen according to their own personal style.

There is nothing described or suggested in Risberg where one author's set of customized screens are generally uniform in their look and feel with other customized screens of other authors.  Therefore, <u>what is described in Risberg is directly opposite to having customized screen between computers (i.e., different authors) that are generally uniform in their look and feel.  Patent Owner believes that Risberg fails to describe the important claim limitation in section 1.3 of claim 1 that requires that customized screens among different computers should be generally uniform in their look and feel</u>.

For these reasons, Risberg fails to describe or suggest claim 1 of the '418 patent.  Thus, claim 1 is not anticipated [by] Risberg and should be confirmed to be patentable over Risberg.

* * *

Risberg fails to describe or suggest claims 13, 24 and 36 of the '418 patent for the same reasons as discussed above in relation to claim 1.  Thus, claims 13, 24 and 36 are not anticipated [by] Risberg and should be confirmed to be patentable over Risberg.

(Dkt. No. 83, at 11-12 (footnotes omitted).)  These definitive statements by the patentee should

be given effect in claim construction.  *Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed.

Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the

public notice function of the intrinsic evidence and protects the public's reliance on *definitive*

statements made during prosecution.") (emphasis added); *Typhoon Touch Techs., Inc. v. Dell,*

*Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and

actions that were taken in order to obtain the patent.").[1]  On balance, although Defendant's proposal of "across multiple computers" is consonant with the above-quoted statements in the Response to ACP, the Court instead adopts the words that appear in the Response to ACP, "among different computers."  (Dkt. No. 83, at 12.)

Defendant's proposal of "almost the same," however, lacks support and would tend to confuse rather than clarify the scope of the claims.  To the extent Defendant relies upon a general-purpose dictionary definition of "uniform" as meaning "the same" (Dkt. No. 69, Ex. 7, *American Heritage Dictionary* 1881 (4th ed. 2000)), such reliance is disfavored.  *See Phillips*, 415 F.3d at 1321-22.  Finally, Defendant stated at the January 30, 2013 hearing that its proposal of "almost the same" is synonymous with "generally uniform" and has been submitted to avoid using the language of the disputed term in the construction of the term.  Because "almost the same" would likely be interpreted as being much narrower than "generally uniform," and because the parties have not presented a substantive dispute regarding the meaning of "generally uniform," Defendant's proposal of "almost the same" is hereby expressly rejected.

---

[1] Defendant also cites the following statements in the Response to ACP:

> . . . the *"generally uniform look and feel"* of section 1.3 of claim 1 [(said screen elements having on-screen characteristics subject to pre-defined constraints providing a generally uniform look and feel with other interface screens of said plurality of computers)] *applies to the overall appearance of the interface screens and not just one element on the screen, such as the quote object*.  The "look and feel" of a screen is not determined by looking at individual elements on a screen, but rather is a comparison of the *entire* screen on one computer versus the *entire* screen on another computer.  Stated differently, "look and feel" is a macro or high level comparison of an entire screen with other screens, not a micro comparison of one element on the screen.

(Dkt. No. 83, at 11 (emphasis in original).)  On balance, these statements do not rise to the level of "definitive" statements regarding a need for uniformity among different computers because the patentee was explaining the importance of looking at the "entire" screen rather than "individual elements."  *Omega Eng'g*, 334 F.3d at 1324.

The Court therefore hereby construes **"a generally uniform look and feel with other interface screens of said plurality of computers"** and **"providing a generally uniform look and feel with other customized interface screens of said plurality of computers"** to mean **"a degree of variation in its on-screen characteristics sufficiently limited to ensure that a user can create customized screens that are generally uniform among different computers."**

**D.  "customized assortment of information content" (Claims 1, 5, 6, 11-13, 15, 16, 18-24, 28, 29, 34-36, 38, 39, 41-44, 46-50, 59, 61, 62, 70-72 & 77)**

| Plaintiff's Proposal | Defendant's Proposal | *Plumtree* |
|---|---|---|
| No construction necessary; plain meaning | "a tailored collection of information associated with and tailored to a particular computer" | Not addressed |

(Dkt. No. 76, Ex. A, 1/2/2013 P.R 4-5(d) Claim Construction Chart, at 2.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "[Defendant's] proposed swapping of words provides no additional clarity, and if anything, imposes additional limitations because different words have different meanings."  (Dkt. No. 62, at 17.)  Plaintiff further argues that "[t]he customization of information content involves the selection of which information content to display, not 'tailoring' it to each computer."  (*Id.*, at 18.)

Defendant responds that "the 'customized assortment of information content' as used by the claims requires that information content available to an end-user consists of less than the entirety of the information content available for selection by the system author."  (Dkt. No. 69, at 22.)  Defendant emphasizes the disclosure of "providing a selection of information customized to each site" ('418 Patent at 1:43-46) and the prosecution history in which the patentee added the phrase "assortment of information content" and distinguished the "Consolatti" reference as

23

lacking disclosure of "selecting an assortment of information content from a plurality of information providers."  (Dkt. No. 69, at 22-23.)  Defendant concludes:

> The system author's selection of a tailored collection of information content is based on the location of a particular kiosk or set of kiosks.  Once the selection is made it is associated with those kiosks to display the correct information content at the correct location.

(Dkt. No. 69, at 24.)

Plaintiff replies that "[a]ll individual computers may have available to them the 'entirety of the latest information'" and that "[t]he customization of information content involves the selection of which information content to display, not 'tailoring' it to each computer."  (Dkt. No. 72, at 8 (quoting '418 Patent at 3:49-50).)  Plaintiff argues that the portions of the disclosure and the prosecution history cited by Defendant use the word "customized," not "tailored."  (Dkt. No. 72, at 8.)

(2)  Analysis

Defendant has emphasized that the Background of the Invention discloses:

> The present invention addresses the development of an electronic kiosk system comprising a large number of individual kiosks located at a variety of different sites for providing a selection of information customized to each site.

('418 Patent at 1:43-46.)

In this disclosure that the "present invention *addresses* . . . providing a selection of information customized to each site" (*id.* (emphasis added)), the use of the word "addresses" is insufficient to limit the claims to requiring a "tailored collection" of information for each computer.  *See Am. Med. Sys. v. Biolitec, Inc.*, 618 F.3d 1354, 1366 (Fed. Cir. 2010) (noting that "the use of the words 'the present invention' can be read to limit the invention *to what is described as such*") (emphasis added) (quoting *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1383 (Fed. Cir. 2009)).  On balance, Defendant's proposal of a "tailored collection"

and of information "tailored to a particular" computer lacks support in the specification and

relates to aspects of the preferred embodiment rather than to the invention as a whole.

As to the prosecution history, the patentee distinguished the "Consolatti" reference,

United States Patent No. 5,764,226, as set forth in a Supplemental Interview Summary that

Defendant has highlighted:

> Consolatti is not concerned with selecting an assortment of information content
> from a plurality of information providers.  Consolatti is not concerned with
> providing a customized assortment of content to an individual computer of a
> plurality of computers.  Consolatti's pre-built interface screen objects are not
> aimed at this functionality.  Consolatti is aimed at providing a software
> development tool for rapid development of interface screens for use in data entry.
>
> It was proposed to amend the claims using specific language in conformity with
> language used in the independent claims of applicant's prior issued Patent Nos.
> 6,460,040 and 6,014,137, namely, "assortment of information content" to clarify
> the nature of applicant's system.

(Dkt. No. 69, Ex. 8, 6/3/2003 Supplemental Interview Summary, at 2.)[2]  The Reasons for

Allowance contain similar language:

> The prior art of record does not teach or fairly suggest the combination of
> elements as recited in each of Applicant's claims 4, 16, 27, and 39.  More
> specifically, prior art of record fails to fairly teach the steps of wherein enabling
> selection of a customized assortment of information content from said plurality of
> information providers and associating a selection of a customized assortment of
> information content for a first computer of said plurality; a selection of at least
> one screen element for said first computer for display on said first computer in
> said one or more customized interface screens.

(*Id.*, Ex. 9, 7/29/2003 Reasons for Allowance, at 1.)

On balance, none of the prosecution history cited by Defendant contains any "definitive

statements" that would justify limiting the claims to "a tailored collection of information

associated with and tailored to a particular computer."  *Omega Eng'g*, 334 F.3d at 1324 ("As a

---

[2] The relevant claim amendments are contained in the prosecution history attached to Plaintiff's
opening brief.  (*See* Dkt. No. 62, Ex. 2, 6/3/2003 Information Disclosure Statement, at 4-16
(Remarks; Listing of Claims) (pp. 128-142 of 188 in Ex. 2).)

basic principle of claim interpretation, prosecution disclaimer promotes the public notice

function of the intrinsic evidence and protects the public's reliance on *definitive* statements made

during prosecution.") (emphasis added).  Instead, as quoted above, the patentee distinguished

Consolatti as disclosing a data entry system rather than an information content system.  In the

'418 Patent, as Plaintiff has argued, customization involves the selection of what information

content will be displayed.

The Court therefore hereby construes **"customized assortment of information content"**

to have its **plain meaning**.

**E.  "pre-defined constraints" (Claims 1, 3, 13, 24, 26 & 36)**

| Plaintiff's Proposal | Defendant's Proposal | *Plumtree* |
|---|---|---|
| No construction necessary; plain meaning | "limitations that are set in advance" | "a boundary that is set in advance, either by the system or by the system designer, for a particular screen element" |

(Dkt. No. 76, Ex. A, 1/2/2013 P.R 4-5(d) Claim Construction Chart, at 2; 2007 WL 5720627,

at *14.)

(1)  The Parties' Positions

Plaintiff argues that "[Defendant's] proposed swapping of words provides no additional

clarity, and if anything, imposes additional limitations because different words have likely

different meanings."  (Dkt. No. 62, at 18-19.)

Defendant responds that its proposal mirrors the *Plumtree* construction, but "the term

'limitation' is easier to understand and would be more consistent with the overall claim language

than 'boundary'" and would reconcile the *Plumtree* construction with the PTO's interpretation

during reexamination.  (Dkt. No. 69, at 24-25.)

Plaintiff replies that "[t]he word 'set' has a different meaning from the word 'defined' — for example, constraints can be 'defined' at point A and later 'set' at point B — and [Defendant] has provided no justification for this word change."  (Dkt. No. 72, at 9.)  Plaintiff nonetheless agrees that "'limitations' is more clear and accurate than 'boundaries' in this context."  (*Id.*)

(2)  Analysis

The *Plumtree* court stated its interpretation while denying a motion for summary judgment of indefiniteness rather than in the context of competing proposed constructions.  *See* 2007 WL 5720627, at *14.  Also, whereas *Plumtree* set forth its other claim constructions within quotation marks, *Plumtree* did not do so in its discussion of "pre-defined constraints."  *Compare id.* at *4-*10 *with id.* at *14.  Further, the use of "boundary" by *Plumtree* is not directly supported by any disclosure in the specification.

Finally, in the reexamination proceedings, the PTO has noted:

> The Examiner agrees with the PO's [(Patent Owner's)] interpretation of "pre-defined constraints" and construes the phrase as constraints, pre-defined *limitations of variability* or a limited range of choices in light of the specification of the '418 patent.  (*See* Abstract; col. 3 line 57 to col. 4 line 4.)

(Dkt. No. 69, Ex. 5, 12/6/2012 Action Closing Prosecution, at 7 (emphasis added).)

At the January 30, 2013 hearing, the Court posed "limitations of variability" to Defendant, and Defendant responded that reference to variability was not necessary but that the Court's suggestion was consistent with Defendant's interpretation of the claim language.  On balance, such a construction would be helpful to the finder of fact, and so the Court reaches a new construction based on consideration of *Plumtree*, the above-quoted prosecution history, and the disclosure in the Abstract of the '418 Patent of "pre-defined limitations on variability."

The Court hereby construes **"pre-defined constraints"** to mean **"limitations on variability that are defined in advance."**

27

**F.  "screen element" and "interface screen element" (Claims 1-3, 5, 6, 9-26, 28, 29, 32-50, 53, 54, 56, 59-72, 74, 75, 77 & 80-86)**

| Plaintiff's Proposal | Defendant's Proposal | *Plumtree* |
|---|---|---|
| No construction necessary except that the constituent term "element" should be construed to mean:<br><br>"a visual item or audio clip presented to the user" | "items that appear on the interface screen" | The term "element" was construed to mean:<br><br>"a visual or audio item presented to the user" |

(Dkt. No. 76, Ex. A, 1/2/2013 P.R 4-5(d) Claim Construction Chart, at 2; 2007 WL 5720627, at *7.)

At the January 30, 2013 claim construction hearing, the parties announced their agreement that the Court should adopt Plaintiff's proposed construction.

The Court therefore hereby construes **"element"** to mean **"a visual item or audio clip presented to the user."**  In light of this agreed construction, the larger terms "screen element" and "interface screen element" do not require construction.

**G.  "information content" (Claims 1, 5-7, 9-13, 15, 16, 18-24, 28-30, 32-36, 38, 39, 41-50, 59-62, 70-72 & 77)**

| Plaintiff's Proposal | Defendant's Proposal | *Plumtree* |
|---|---|---|
| No construction necessary; plain meaning | "content from an information provider that is to be displayed" | Not addressed |

(Dkt. No. 76, Ex. A, 1/2/2013 P.R 4-5(d) Claim Construction Chart, at 2.)

<u>(1)  The Parties' Positions</u>

Plaintiff's opening brief presents no separate argument on this term.  (*See* Dkt. No. 62.)

As to the larger term "customized assortment of information content," discussed in Section III.D., above, Plaintiff proposes that no construction is necessary.  (*Id.*, at 17-18.)

28

Defendant argues that "interface screen elements do not come from information providers" and that "[Defendant's] proposed construction properly recognizes the difference between interface screen elements and information content."  (Dkt. No. 69, at 26.)  For example, Defendant argues:

> One example of how "information content" and "interface screen element" may be confused is text.  Text may be either information content or an interface screen element depending on the source of the text.  Text obtained from an information provider, like the text for a restaurant menu (2:20-22) is information content.  Text pre-defined by the software creator, like the text for a "menu button" (Fig. 2A) is an interface screen element.

(*Id.*)  Defendant further argues that during prosecution, "[t]he patentee argue[d] that the prior art allows customization of the sections of [a] newspaper (information content) but does not allow for customized interface screen elements."  (*Id.*, at 27.)

Plaintiff replies that Defendant's proposal is redundant because "all of the independent claims already state that 'information content' comes 'from an information provider.'"  (Dkt. No. 72, at 10.)  Plaintiff also argues that "the claims provide no limitation on who can be the 'source' of 'interface screen elements,' nor does the patent or prosecution history state that the same actor cannot be a source of both, nor do they state that a system author cannot define constraints on how 'information content' is displayed."  (*Id.*)  Plaintiff further argues that "the claims already differentiate 'information content' from 'interface screen elements,' including because 'interface screen elements' (wherever they originally came from) 'hav[e] on-screen characteristics subject to pre-defined constraints . . .'"  (*Id.* (quoting '418 Patent at Claim 1).)  As to Defendant's proposal of "to be displayed," Plaintiff replies that Defendant "is either being redundant or seeks a mere word swap for an unwarranted, results-oriented meaning."  (*Id.*)

<u>(2)  Analysis</u>

Claim 1 is representative and recites (emphasis added):

    1.  A method for providing customized assortment of *information content* from a plurality of information providers for display in one or more customized interface screens in a plurality of computers, comprising:

        enabling selection of a customized assortment of *information content* from *information content* from said plurality of information providers;

        enabling selection of at least one interface screen element from a plurality of pre-defined interface screen elements for inclusion in said customized interface screens,

            said screen elements having on-screen characteristics subject to pre-defined constraints providing a generally uniform look and feel with other interface screens of said plurality of computers; and

      associating a selection of a customized assortment of *information content* for a first computer of said plurality and a selection of at least one screen element for said first computer for display on said first computer in said one or more customized interface screens.

The claim thus provides ample context for the term "information content" and, as Plaintiff agrees, the claim language itself explains that "information content" is "from a plurality of information providers."  Also, as Plaintiff has argued, the claims do not require that the source of the information content must necessarily be different than the source of the interface screen elements.

Defendant relies upon reexamination prosecution history in which Plaintiff distinguished a reference that "does not allow a user to customize the elements on an interface screen, but only allows a user to customize what sections of a newspaper to view" and that "fails to describe that a user is permitted or allowed to customize the elements on the interface screen (e.g., the 'section' button) of the viewing device."  (Dkt. No. 69, Ex. 11, 9/18/2012 Patent Owner's Response in *Inter Partes* Reexamination, at 5 & 7; *see id.* at 9 ("Screen elements do not map and are not equivalent to sections of a newspaper.").)  Further, Defendant has cited comments in the January 23, 2013 Response to ACP regarding purported confusion about whether "an 'interface screen element' is equivalent to a newspaper section as alleged in the ACP," such that "[t]here is major confusion over how the Patent Office is interpreting" Claim 1 of the patent-in-suit.  (Dkt.

No. 83, at 9.)  On balance, these comments by the patentee about purported confusion by the PTO are insufficient for the Court to find that "information content" lacks a plain meaning, in the context of the claims, that can be readily applied by the finder of fact.  Upon review, nothing in the prosecution history cited by Defendant demands any additional limitations for the apparently generic term "information content."

Finally, Defendant urged at the January 30, 2013 hearing that "information content" is "to be displayed" because the purpose of an information provider providing information content is for that content to be displayed.  To whatever extent the claims require that "information content" is displayed, such requirements are addressed by other claim language.  Defendant has not justified a finding that "information content," in general, is always "to be displayed." Defendant's proposal of "to be displayed" is therefore hereby expressly rejected.

Having rejected Defendant's proposed construction and having found that "information content" has a plain meaning that is applicable here, no further construction of the term is required.  *U.S. Surgical*, 103 F.3d at 1568; *see O2 Micro*, 521 F.3d at 1362.

The Court therefore hereby construes **"information content"** to have its **plain meaning**.

## IV.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon

by the parties.  As a part of such mediation, each party shall appear by counsel and by at least

one corporate officer possessing sufficient authority and control to unilaterally make binding

decisions for the corporation adequate to address any good faith offer or counteroffer of

settlement that might arise during such mediation.  Failure to do so shall be deemed by the Court

as a failure to mediate in good faith and may subject that party to such sanctions as the Court

deems appropriate.

**So ORDERED and SIGNED this 5th day of February, 2013.**

_____

RODNEY  GILSTRAP

UNITED STATES DISTRICT JUDGE